IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

EUGENE MICHAEL BUTLER                                               PETITIONER

V.                                              CIVIL ACTION NO. 1:23-cv-199-HSO-LGI

STATE OF MISSISSIPPI and
BURL CAIN                                                        RESPONDENTS

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Eugene Butler files this petition for writ of habeas corpus relief pursuant to 28 U.S.C. § 2254.  Having reviewed the record and all applicable law, the undersigned recommends that the petition be denied.

Butler was convicted of culpable negligence manslaughter following a fatal boating accident on Bayou Caddy in Hancock County, Mississippi.  In June 2016, the boat he was piloting collided with another boat piloted by Ryan Necaise.  Both Butler and Necaise walked away, but Vanessa Mauffray, the passenger in Necaise's boat, died from her resulting injuries.  The relevant facts are accurately described in the state court's opinion and repeated verbatim here with subheadings added for additional clarification.

**Necaise's Version of Events**

Necaise and Mauffray were out for a day of checking and setting crab traps and trolling in a small boat that Necaise had borrowed from a friend.  At trial, Necaise testified that the bank was eight or nine feet away on his right-hand side when the accident occurred.  He had just set his last crab trap and was behind the steering wheel, maneuvering through one curve of an "S" shaped curve, when he saw a boat in the other

curve.  Necaise said that Butler was on the wrong side of the waterway when he came out

of the curve, but this was not unusual when navigating a curve; he assumed that Butler

would move back to the proper side.  Necaise testified that he put his boat in neutral and

waited for Butler to change course, but Butler never did—he continued straight towards

Necaise.  Necaise estimated that at this point the other boat was traveling at a speed of at

least thirty miles per hour and said he was going six or seven miles per hour.  This is in

contrast to what Necaise told Mark Barraclough with the Mississippi Department of

Marine Resources marine patrol, Investigator Michael Strickland, and Lieutenant Bryce

Gex—that he was going three to five miles an hour when the accident occurred.  The

accident reconstructionists and investigators testified that when Necaise's boat was

removed from the water, the throttle was three-quarters down.[1]  Necaise said he was not

sure if the lock on the throttle worked.

Necaise said that when he first saw Butler (rather than just the boat) the two boats

were about thirty feet apart, and Butler was turned around facing the motor.  According

to the accident reconstructionists and investigators, they were probably closer to 600 feet

apart. Necaise did not disagree.  When this discrepancy was pointed out, he testified that

he was not good with measurements and distance.  At the time, Necaise could not

determine whether Butler was standing at the steering wheel or near the motor at the rear

of the boat.  Necaise said the area where the collision occurred was about twenty feet

---

[1] A "throttle" is used to shift gears on a boat.

wide.  (It was later shown to be seventy feet wide.)  Necaise stated that based on the rules

of the road for the Coast Guard, Butler should have been the one to move.[2]  According to

Necaise, Butler never turned toward the far side of the bayou.  In an effort to get Butler to

turn, Necaise said he stood up and yelled and waved his arms trying to get Butler's

attention.  At trial he testified that when he realized Butler was not paying attention, he

turned his boat to the right, despite the fact that he was already so close to the bank and

he "was going to run my boat up on land, but I was moving so slow, I had to turn the

wheel.  I was so close to land, but he was on top of me already."  This testimony was

consistent with what he told Investigator Barraclough who confirmed that "standing up

and waving when another boat is headed towards you[ ]" is a typical evasive action.

Patrick Carron, an investigator for the Mississippi Marine Resources Department, was

admitted as an expert in marine safety and accident reconstruction and testified that there

would have been little to no room for Necaise to move his boat further to his right in an

attempt to avoid the accident, but technically Necaise had an obligation under the rules to

change his course or speed.  Investigator Carron testified that if Necaise had moved to the

left he probably would have been hit broad side.  Investigator Strickland testified that

---

[2] On this point, the Mississippi Court of Appeals noted: "No formal name of a boating safety rule book or manual appears in the record before us, nor did the parties provide one. The rules referenced by investigators at trial appear to be those set forth by the Navigation Center of United States Department of Homeland Security and the United States Coast Guard rules, which are currently available at https://www.navcen.uscg.gov/?pageName=NavRulesAmalgamated (last visited Mar. 22, 2022). However, we base our analysis on the parties' arguments and the appellate record."

shifting into neutral would have been in compliance with any duty on Necaise's part to take evasive action.

The boats collided bow to bow, and Necaise testified that he was thrown over the center console, landing on the floor of his boat.[3] Previously, he had told Investigator Michael Strickland that he was thrown from the steering controls to the bottom of the boat, and he had told Mark Barraclough, with the Mississippi Department of Marine Resources marine patrol, that he fell backward. Necaise recalled hearing something that sounded like a motor passing over him. He testified that his boat started sinking immediately, so he got Mauffray and helped her to the bank. They were so close to the shore that he was able to step from the boat to the bank. Necaise said that Butler was already on the bank and he helped get Mauffray to land. Necaise then attempted to get Butler's boat, which was partially on the bank, into the water. Butler joined Necaise and after a few minutes they had the boat fully in the water. While this was happening, Necaise said that Butler "kept telling me he was sorry, and he wasn't paying attention." Necaise got in the boat and Butler handed Mauffray to him. At trial Necaise testified that the boat would not crank and that Butler did something with the motor. This took a minute or two, and then they went to the dock. At some point, Butler told Necaise there was something wrong with the "shifter." Necaise was unsure whether the motor was off when they approached the dock, but they "glided into [it]" and "kind of hit the dock a

---

[3] The "bow" is the front of a boat.

little bit." Attempts to relay information to an ambulance while on the way to the dock were unsuccessful, so upon reaching the marina, Necaise said he went inside and asked "Timmy" to call 911. He later testified that he ran to "Timmy's house" and got him to call 911.

Investigator Carron was questioned at trial about the inconsistencies Necaise made. Specifically, when asked how the throttle could have been at three-quarters when Necaise said it was in neutral at the time of the collision, Investigator Carron said that "based on the physical evidence, the defendant's vessel exited Ryan Necaise's vessel in that back starboard quadrant [where the throttle was located]. That boat, that 20-foot Hydra Sport that [Butler] was driving could have easily pushed that throttle to where it was." There was additional expert testimony that the throttle could have been moved during the salvage operation. Investigator Carron also said that he did not find it significant that Necaise gave slightly different statements about where he fell on impact. When asked why Necaise told one investigator he heard Butler's boat before he saw it and told another investigator the opposite, Investigator Carron responded only that the court would have to decide Necaise's credibility.

### Necaise's Toxicology Results

Marijuana and a pipe were found on Necaise's boat after the accident (although it was not determined that it belonged to him), and he admitted to having smoked marijuana several hours before the collision. That admission was confirmed by a preliminary toxicology test in which cannabinoids were found in Necaise's blood. However, a follow-up test to confirm the preliminary findings was negative. State witness Albert

Phillips, a forensic scientist with the Mississippi Forensics Laboratory, testified that the initial test was a "presumptive" test, not a "confirmatory" test. According to Phillips, "the screen is actually looking for the inactive metabolite in the blood as an indicator that there could be THC there or the carboxylic acid also." Phillips stated that the presumptive results are not classified as "positive;" they are simply not negative and are sent for further testing that, as in this case, showed neither inactive metabolite nor a parent compound of THC. When questioned about the absence of inactive metabolite or THC in Necaise's system when he admitted to having smoked marijuana several hours before the incident, Phillips' only explanation was that the timing of Necaise's marijuana use must have been wrong. Over Butler's argument to the contrary, the trial court granted the State's motion in limine to suppress this information.[4]

### Butler's Version of Events

Butler was fishing but had decided to call it a day and started for the dock about ten minutes before the collision. When he attempted to crank the boat's motor to head in, it would not start, and Butler determined that the shift linkage was broken.[5] He removed the cover from the motor and was able to manually start it. Butler and Necaise were coming from opposite directions on the bayou when the accident occurred. Butler said he was passing through a blind curve (meaning they could not see around the bend)

---

[4] On this point, the court of appeals noted that "Butler presented only a thin argument before the trial court in opposition to the State's motion in limine—citing no applicable rules or caselaw. However, given the importance of the right of an accused to present a defense, we decline to determine whether he waived his right to appeal this issue, instead we analyze the appropriateness of the trial court's grant of the motion in limine."

immediately before the accident. Butler testified that before beginning the curve, he saw nobody in front of him (where Necaise would have been) and he could actually see all the way to the next curve. He did not believe that Necaise would have been able to see him. After starting through the curve, he briefly turned to make sure no one was behind him. When he turned to the front again, Necaise's boat was coming toward him. Unfortunately, they collided instead of passing each other on opposite sides of the waterway. Butler told investigators that the accident occurred in the straightway, although at trial he was adamant that it occurred in the canal.

It is undisputed that there is no set speed limit in the area where the accident occurred. At trial, Butler testified that he was traveling in the middle of the bayou at twenty-five to thirty miles per hour. This speed is consistent with findings from the accident reconstructionist. Butler further testified that he was standing at the center console with both hands on the steering wheel and that Necaise (also in the middle of the bayou) was moving at approximately fifteen miles per hour. This was the first time Butler had told anyone that Necaise was in the middle of the bayou. During cross-examination, Butler testified that twenty-five to thirty miles per hour was a safe speed (even in a blind curve) as long as there were no other boats around. At trial, when asked, "You didn't know if there were any boats in the area, right?" Butler responded, "No, I did not."

Butler said he only had three to five seconds to react. At trial he stated that when he turned the boat to avoid the accident, Necaise turned his boat in the same direction. Butler said he attempted to turn in the opposite direction, but the boats collided. This

recollection is consistent with what he told Officer Daniel Boyer after the accident. According to Butler, he did not slow down, and neither did Necaise.  Butler stated that he did everything he could to avoid the accident and that he would have slowed down if he had seen Necaise earlier.  Butler also stated at trial that the broken shift linkage, which did not cause any steering issues, did affect the way he changed gears.  For example, to shift to neutral, he had to lower the throttle to neutral and walk back to the motor to put the boat in neutral.  However, Butler said he had not moved from the center console when traveling through the curve and that Necaise would have only seen the back of his head, not his back.  Butler further stated that at the rate of speed he was going, it would have been impossible for him to walk back to the motor to change gears.

The force of the collision threw Butler against his windshield, and he testified that although he did not know exactly what happened, the boats struck bow to bow at an angle, with Butler's boat actually going over Necaise's boat.  Necaise's boat began to sink immediately, and Butler's boat ended up partially on the bank.  Butler used his shirt to help staunch Mauffray's bleeding and helped Necaise get her into his boat.  Butler recalled telling Mauffray he was sorry, but he did not recall telling Necaise that he had not seen them.  The two men dislodged the boat from the bank, but it took a couple of minutes to get the motor running. When the boat started, Butler drove them to the marina where he says he docked without incident and called 911 to report the accident.

### The Investigation

Immediately after the collision, Investigator Barraclough spoke with Necaise and Butler.  In his report and at trial, he attributed the accident to Butler's inattention and a

navigational rule violation.  Investigator Michael Strickland testified that Butler told him the shift linkage was broken before he set out that morning.  Testimony was also provided by Investigator Carron regarding the broken shift linkage.  He said this would have kept Butler from being able to slow down or come to a stop.  Butler told Investigator Carron that he had tried to correct by swerving rather than stopping in order to avoid the accident.  Investigator Carron testified that Butler should have had plenty of room to determine a safe course of travel, and the fact that he said he was unable to do so was "consistent with what Mr. Necaise said about the defendant being turned around or not paying attention."  He also said that he was unable to pinpoint exactly at what point on Butler's path he should have been able to see Necaise.  Investigator Carron further stated that "[t]he fact that [Butler] tried to correct indicates that he was doing something or he was where he shouldn't be as far as his position in the body of water."  This statement was endorsed by Investigator Strickland, and Officer Boyer testified that Butler told him he was on the wrong side of the bayou.  However, Investigator Carron admitted that he did not ask Butler which side of the bayou he was on "[b]ecause everything [the investigators] looked at indicate[d] that [Butler] was on the wrong side of the bayou."  According to Investigator Carron, the angle of impact and ultimate landing place of the boats makes it impossible for the accident to have occurred in the middle of the bayou.  Further, even if the accident occurred in the curve, rather than in the straightway, Investigator Carron said that Butler was still on the wrong side of the bayou.

Investigator Carron testified at trial:

And based upon everything we saw with the physical evidence, based upon all the statements we reviewed, it's clear to us that there was one person that didn't do those things necessary.  The defendant wasn't on his side of the channel.  His speed was unsafe.  The testimony he gave about his -- he had three seconds to react, three to five seconds to react, and I've explained the length of the waterway as far as the transit time.  Relatively speaking he'd have 13 and 16 seconds to see that vessel if he were being attentive, so what was he doing if he only had three to five seconds to react?

So that's everything that we took into consideration, the totality of everything we looked at, and that's how we reached the conclusion of where we are today.

Investigator Carron's ultimate conclusion, to a reasonable degree of scientific certainty, was that despite having thousands of hours' experience on the water,  Butler acted negligently and violated several boating rules, including: Rule 5 (maintaining a proper lookout); Rule 6 (traveling at a speed safe for conditions); Rule 8 (avoiding a collision if one is imminent); Rule 9 (staying to the right on respective sides of the waterway); and Rule 14 (keeping right to avoid a collision when two boats meet on the water).  Further, Investigator Carron testified that Butler's speed and inattentiveness contributed to the other violations.

### Butler's Toxicology Results

Butler testified that he was a habitual marijuana user and had last smoked marijuana two days before the accident but had not had a drink for a week.  No field sobriety test was administered at the marina, and there was no testimony from anyone present at the scene that Butler appeared to be under the influence of drugs or alcohol.  Butler voluntarily submitted to a breathalyzer test.  Investigator Carron testified that Butler did not blow into the Intoxilyzer 8000 with sufficient force for it to register

accurately (which Butler denies); although during cross-examination at trial, Investigator Carron testified that the breathalyzer's outcome read "general diagnostic fail" rather than "insufficient sample."  Butler then volunteered to submit to a blood test, but Investigator Carron decided that he needed a warrant, which he later obtained from Judge Tommy Carver.  Investigator Carron's decision to request a warrant was based on the fact that (1) he thought Butler's eyes were glassy; (2) Butler initially denied using prescription drugs before admitting that a day or two before the accident, he had taken a Lortab that had been prescribed by his dentist; and (3) there were several beer cans (both empty and full but at room temperature) on Butler's boat.

Butler's blood test, that occurred approximately four hours after the accident, showed positive results for 11-Nor-9-carboxy-Delta9-THC at a concentration of "31 nanograms per mil."  State witness Maury Phillips, a forensic scientist with the Mississippi Forensics Laboratory, testified that 11-Nor-9-carboxy-Delta9-THC is an inactive metabolite, meaning it has no pharmacological attributes and does not affect a "person's brain or his skills."  In an infrequent user, Phillips said this amount would be indicative of the fact that someone has ingested marijuana fairly recently.

The blood test was positive for Delta-9-THC at a level of 3.7 nanograms per mil. Phillips testified that while it is possible for 3.7 nanograms per mil of Delta-9-THC to affect one's motor skills, decision making, and reaction time, it largely depends on the frequency with which the individual ingests marijuana.  He further testified that there was no way to determine how the 3.7 nanograms per mil would have affected Butler at the time of the collision.  It was also possible that it might not have impaired Butler at all.

But Phillips noted that THC levels in the blood dissipate rapidly, and they would have been higher in the time leading up to the blood test.  Phillips went on to say that it is "well recognized in the forensic community that a person's [Delta-9] THC concentration in the range from 1 to 5 nanograms per mil in a DUI case can be a good indication that that person had smoked marijuana in the last couple hours, provided that they are an infrequent user.  Now, a frequent user, that's a different situation." Phillips also testified that the minimum level in Mississippi for an alcohol-related DUI is .08 percent blood-alcohol concentration, the generally accepted equivalent level of THC is 13.5 nanograms per mil, and Butler's sample contained 3.7 nanograms per mil.[5]

Butler's toxicology expert, Dr. Jimmy Valentine, stated that because the outcome of the Intoxilyzer 8000 read "diagnostic fail," it was not indicative of how hard Butler blew into the machine.  He testified that just because marijuana is present in someone's blood does not necessarily mean it would impair their judgment or ability to function (particularly a habitual user); although it could if someone was in the euphoric stage, which occurs soon after ingesting marijuana.  Dr. Valentine did not believe that Butler's actions around the time of the accident were consistent with someone who was impaired due to marijuana use.  He testified that driving too fast was not normally associated with marijuana use and that it would be more common for someone under the influence of

---

[5] Mississippi has no established "intoxication" level pertaining to marijuana.

marijuana to drive slowly.  Butler's attorney elicited the following testimony from Dr. Valentine at the trial:

> Q. Are Mr. Butler's actions after the incident consistent with someone who's sober?
>
> A. It's certainly consistent with somebody that's got their faculties about them, correct.
>
> Q. Would it be possible for Mr. Butler to have been in a euphoric state at the time of the incident and have sobered up that quickly from that euphoric state so as to act in the manner he did?
>
> A. No, sir, it would not have been.

Dr. Valentine also said that Maury Phillips had failed to take into account the margin of error for the blood test and that Butler's THC level could have been as low as 2.9 nanograms per mil.  (He admitted on cross-examination that it could have been higher, too.)  He further contradicted Phillips's testimony that 13.2 nanograms per mil is the equivalent of .08 percent for alcohol.  He did, however, agree with Phillips that the presence of 3.7 nanograms per mil of THC could mean different things depending on whether Butler was a habitual or infrequent user.  While he believed Butler's test was in line with that of a frequent user, he had never spoken with Butler about his marijuana usage.

Butler was not charged with a crime on the day of the accident, nor was he ever charged with boating under the influence; he was allowed to go home after the blood test. *Butler v. State*, 354 So. 3d 308, 310–13 (Miss. Ct. App. 2022)

Upon hearing the evidence, the jury convicted Butler of culpable negligence manslaughter.  He was sentenced by the Circuit Court of Hancock County, Mississippi,

as a habitual offender to a twelve-year term of imprisonment in the Mississippi

Department of Corrections ("MDOC").  The Mississippi Court of Appeals affirmed the

conviction and sentence, rejecting his appellate claims that evidence of the other boater's

drug use was erroneously excluded, and the evidence was insufficient to support his

conviction.  *Butler v. State*, 354 So. 3d 308 (Miss. Ct. App. 2022) (Miss. Ct. App.), *reh'g*

*denied* (June 21, 2022).  Butler's motion for rehearing was later denied.  Aggrieved,

Butler petitioned for certiorari review.  As his sole claim, Butler argued that denying him

the opportunity to present evidence of the boater's drug use "deprived him of his

constitutional rights to assert a theory of defense as well as his opportunity to fully

confront witnesses against him."  Petitions filed by the International Institute for Legal

Writing and Reasoning for leave to file amicus briefs on Butler's behalf were denied.

After initially granting certiorari, the Mississippi Supreme Court dismissed the certiorari

petition finding no further review necessary.

      In this court, Butler initially raised six grounds for relief, only two of which were

raised in the state's highest court.  The remaining four were raised for the first time here:

| | |
|---|---|
| Ground One: | Whether the State violated the U.S. Supreme Court judgment in *Brady v. Maryland*, the petitioner's Constitutional right to a trial by jury, and Mississippi Court precedent by deciding a critical question of fact in limine with no jury present. |
| Ground Two: | Whether the exclusion of Mr. Necaise's admission was based on a misinterpretation of the Mississippi Rules of Evidence and a violation of *Brady v. Maryland*. |
| Ground Three: | Whether by withholding a highly emotional witness statement that was in its possession when it added the father of the deceased to its witness [list], the State |

> violated Mississippi Rules of Criminal Procedure and
> *Brady v. Maryland*.

Ground Four:     Whether the State's "constellation" of allegedly
culpable acts and omissions violated precedent and
enabled the jury to return a verdict without unanimity
on any specific act or omission.

Ground Five:     Whether the evidence, viewed in the light most
favorable to the prosecution, was insufficient to
disprove the petitioner's version of events leading up
to the collision.

Ground Six:      Whether the jury instructions were inadequate,
erroneous and prejudicial.

Because only Grounds One and Two challenging the exclusion of the other boater's drug

use were fully exhausted, the undersigned issued a report recommending that the petition

be dismissed for failure to exhaust unless he withdrew his unexhausted claims.  Butler

responded by filing an amended petition with only the exhausted claims, framing them as

follows:

Ground One:      Whether petitioner was denied his Constitutional rights
when the trial court decided a critical question of fact
in limine and prevented petitioner from having the
opportunity to effectively cross examine the State's
chief witness against him.

Ground Two:      Whether the exclusion of Mr. Necaise's admission was
based on a misinterpretation of the Mississippi Rules
of Evidence.

Having now considered his exhausted claims, the undersigned submits that Butler is not

entitled to relief, and his petition should be dismissed with prejudice.

**DISCUSSION**

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), codified at 28 U.S.C. § 2244(d), precludes this Court from granting Petitioner federal habeas corpus relief on claims adjudicated on the merits unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This court reviews questions of law as well as mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1) of the AEDPA, while questions of fact are reviewed under 28 U.S.C. § 2254(d)(2).

Under the first prong, the clauses "contrary to" and "unreasonable application of" are independent bases for granting federal habeas relief. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A state court's decision is "contrary to" federal law if it contradicts Supreme Court precedent or reaches a different result on materially indistinguishable facts. *Id.* "[C]learly established Federal law includes only the holdings of the Court's decisions," *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 188 L. Ed. 2d 698 (2014) (internal citation and quotation marks omitted). To prevail, a defendant must point to "Supreme Court precedent that is 'opposite to' or 'materially indistinguishable'" from the case at hand. *Russell v. Denmark*, 68 F.4th 252, 265 (5th Cir. 2023). (internal quotations and citations omitted). "This is such a high bar that "in most AEDPA cases, the 'contrary to' prong does not apply." *Id.* Under the

"unreasonable application" clause, a federal habeas court may grant relief if the state court "correctly identifies the governing legal principle" but then "unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). The state court's decision must be objectively unreasonable, not merely erroneous or incorrect. *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010).

AEDPA's second prong requires that federal courts defer to a state court's factual determinations unless they are based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Morales v. Thaler*, 714 F.3d 295, 301 (5th Cir. 2013). Deference is critical because federal courts have no authority to grant habeas corpus relief simply because "we conclude, in our independent judgment, that a state supreme court's application of [federal] law is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002); *Jasper v. Thaler*, 466 F. App'x 429, 435 (5th Cir. 2012). Thus, we presume the state court's determination of a factual issue is correct, unless a petitioner rebuts the presumption with clear and convincing evidence. *See* 28 U.S. C. § 2254 (e)(1).

Because Butler's arguments in grounds one and two are related, the Court addresses them together. In essence, Butler argues the trial court's misconstruction of the Mississippi Rules of Evidence impaired his ability to present a complete defense by limiting testimony and evidence of Necaise's admitted marijuana use hours before the accident. Prior to trial, Butler had intended to argue that Necaise could not reliably testify to how the collision happened because he failed a preliminary drug test. The State

filed pretrial motions, however, to exclude the preliminary toxicology report and other evidence of Necaise's drug use as inadmissible under 404(b) and 608 of the Mississippi Rules of Evidence, which the trial court granted.

The Mississippi Court of Appeals took care to point out on direct appeal that Butler did not file a response to the motions to exclude, nor did he refute the conclusory toxicology results showing no THC or inactive metabolite in Necaise's blood sample. Butler also didn't object to the conclusory test results being admitted into evidence at trial.   His only objection was to the State's request to exclude Necaise's admission that he had smoked marijuana that day "because under his theory of the case, he thought the jury should know Necaise admitted to smoking marijuana eight hours before the accident." *Butler*, 354 So. 3d at 317–18.

Butler re-urges this position here.   He maintains that "by excluding factual evidence—specifically M. Necaise's admission [of drug use], the [preliminary] test confirming it, and the discovery of a narcotic and paraphernalia in the boat Mr. Necaise was operating," the state courts violated his constitutional rights.   The Mississippi Court of Appeals rejected this argument, explaining as follows:

> Rule 401 of the Mississippi Rules of Evidence defines evidence as "relevant" when "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." Despite the fact that marijuana was found on the boat Necaise was driving, ownership of the drug was never substantiated. Although Necaise admitted to smoking marijuana several hours before the collision, and the preliminary drug test noted the possible presence of marijuana, the conclusory drug test was indicative of the fact that no marijuana was in his system at the time of the collision. Simply stated, because there was no proof that Necaise was either in possession of, or under the influence of, marijuana at the time of the accident, any

evidence or testimony relating to toxicology results, drugs recovered, or drug activities involving Necaise would be irrelevant and would not assist the jury in determining the outcome of the case. As this evidence is not relevant under Rule 401, it is not admissible under Rule 402.

*Butler*, 354 So. 3d at 318–319.

The appeals court found the evidence was also inadmissible under Miss. Rule Evid. 608(b), which governs evidence related to a witness's credibility.  That rule provides in relevant part that the trial court has the discretion to allow inquiries into specific instances of a witness's conduct on cross-examination "if they are probative of the[ir] character for truthfulness or untruthfulness." [6]  Because Necaise's marijuana use was not probative of his character for truthfulness or untruthfulness, the court ruled that it was not admissible under 608(b).  *Butler*, 354 So. 3d at 318 (citing *Brent v. State*, 632 So. 2d 936 (Miss. 1994) ("If the past conduct did not involve lying, deceit, or dishonesty in some manner, it cannot be inquired into on cross-examination."); *Johnston v. State*, 618

---

[6] Miss. R. Evid. 608 provides in relevant part:

> **(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> > **(1)** the witness; or
> > **(2)** another witness whose character the witness being cross-examined has testified about.
>
> By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

So. 2d 90, 94 (Miss. 1993) ("Neither robbery nor marijuana use, the activities about which Johnston sought to elicit testimony, are probative of [thge witness's] character for truthfulness or untruthfulness."   From there, the appeals court concluded that because the "conclusory drug test was negative for the presence of marijuana," Butler could not show that "Necaise's alleged marijuana use impacted his 'memory and powers of observation."

To begin, this Court does not consider whether the state court's application of state evidentiary rules was correct—only whether Butler was denied "a meaningful opportunity to present a complete defense." *Nevada v. Jackson*, 569 U.S. 505, 509, 133 S. Ct. 1990, 186 L. Ed. 2d 62 (2013) (per curiam) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)).  The Supreme Court has long observed: "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. S. Carolina*, 547 U.S. 319, 319, 126 S. Ct. 1727, 1728, 164 L. Ed. 2d 503 (2006) (quoting) (*Crane*, 476 U.S. at 690).  "Only rarely" has the Supreme Court held that "the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada*, 569 U.S. at 509 (discussing state rules of evidence and distinguishing cases where a rule "did not rationally serve any discernable purpose" or "could not be rationally defended," or where the state "did not even attempt to explain the reason for its rule").  On the contrary, the Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and

reliability—*even if the defendant would prefer to see that evidence admitted.*" *Crane*, 476 U.S. at 690 (emphasis added) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)).  The "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326.   This is particularly true with rules "regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged."  *Id.*

With these principles in mind, courts considering complete-defense claims have required petitioners to show that "the excluded evidence is indispensable to the theory of defense; and the [lower] court fail[ed] to provide a rational justification for its exclusion." *United States v. Kuhrt*, 788 F.3d 403, 421 (5th Cir. 2015).  *United States v. Reed*, 908 F.3d 102, 113 (5th Cir. 2018).  Butler makes neither showing here.

 As the record reflects, Butler's theory of the case was that the collision was a tragic accident, not the result of any negligence on ***his*** part.  To this end, the defense attempted to cast doubt on the reliability of Necaise's testimony throughout trial, challenging both his recollection of events and his credibility, and calling him a liar more than once.  But, as noted above, the appeals court rejected this argument explaining that "all evidence in support of the defendant's theory of the case must comport with the Mississippi Rules of Evidence," and despite Butler's claims, "any evidence of Necaise's prior drug use was irrelevant to Butler's theory that the collision was a tragic accident rather the result of any negligence on his part." *Butler*, 354 So. 3d at 319.  Indeed, the

record reflects that its exclusion did not prevent Butler from asserting that the collision was a tragic accident or from challenging Necaise's recollection and credibility at trial. Quite the opposite, Buther argued in closing argument that Necaise's testimony about his speed before the collision, the width of the bayou, whether his boat was in neutral, and whether he was thrown forward or backward upon impact were all inconsistent. He also denied ever telling Necaise that he wasn't paying attention.

Still, Butler asserts that Necaise's admission of marijuana use was important for impeachment purposes to challenge both Necaise's reliability as an eyewitness and to expose his potential bias or motive. The undersigned notes that Butler has never expressly asserted that the collision occurred because Necaise was under the influence, but he has suggested that Necaise's marijuana use was essential to showing that Necaise had a motive to deflect from his own actions that day.[7] The appeals court rejected the notion, however, that the evidence was admissible for impeachment purposes. Necaise's admission and the presence of marijuana on his boat, notwithstanding, the court underscored the fact that the conclusory drug test showed there was no marijuana in his system *at the time of the collision*:

> Simply stated, because there was no proof that Necaise was either in possession of, or under the influence of, marijuana at the time of the accident, any evidence or testimony relating to toxicology results, drugs recovered, or drug activities involving Necaise would be irrelevant and would not assist the jury in determining the outcome of the case. As this

---

[7] Throughout trial, for example, Butler suggested that Necaise was attempting to conceal the fact that he was crabbing without the appropriate license that day.

evidence is not relevant under Rule 401, it is not admissible under Rule 402.

*Butler*, 354 So. 3d at 318.  Though Butler maintains that the exclusion of Necaise's marijuana use deprived him of his opportunity to present a complete defense, he presents nothing in his habeas petition to overcome the deference we must afford to the state court's decision.

Again, the question is not whether this Court would, in the first instance, have made the same ruling as the Mississippi Court of Appeals.  Rather, this Court must ask whether that court contradicted or unreasonably applied clearly established federal law as declared by the Supreme Court.   Butler has not pointed to, nor does the Court find, a Supreme Court case with which the state court decision directly conflicts.  28 U.S.C. § 2254(d)(1)'s "clearly established law" clause refers to Supreme Court holdings. *See Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). On the contrary, the state court's rulings are based on well-established state and federal rules concerning the admissibility of evidence including, to the extent applicable here, rules "regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." *Id.  Holmes*, 547 U.S. at 326;

Even if the exclusion of Necaise's drug use amounts to a constitutional error, habeas relief is not available unless the erroneous exclusion had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  "This is a high hurdle,

even without AEDPA's added level of deference," and it is one Butler fails to meet. *Gonzales v. Thaler*, 643 F.3d 425, 430–31 (5th Cir. 2011).

Any probative value derived from Necaise's admitted marijuana use and preliminary drug screen would have been mitigated once the conclusory results were presented.  And, "[a]lthough a defendant obviously has a right to attempt to establish his innocence by showing that someone else committed the crime, he still must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged 'alternative perpetrator.'" *Caldwell v. Davis*, 757 F. App'x 336, 340–41 (5th Cir. 2018).  Though Butler accused Necaise of lying about the events and questioned whether Necaise took sufficient evasive action to avoid the collision at trial, he has not met this particular burden.  *See Butler*, 354 So. 3d at 322 (Lawrence, J. concurring) (observing that Bulter "never raised at trial or on appeal any acts of Necaise's that would amount to a proximate-cause issue" concerning the victim's death).

Even if Necaise's drug use had been admitted, there was sufficient evidence for the jury to find ***Butler*** guilty beyond a reasonable doubt.  As the Mississippi Court of Appeals explained:

> [O]ther factors were present upon which a jury could find Butler guilty of culpable negligence manslaughter.  Officer Carron told the jury that Butler violated five boating rules in the time leading up to the collision: Rule 5 (maintaining a proper lookout); Rule 6 (traveling at a speed safe for conditions); Rule 8 (avoiding a collision if one is imminent); Rule 9 (staying to the right on respective sides of the waterway); and Rule 14 (keeping right to avoid a collision when two boats meet on the water). Other investigators corroborated Office Carron's testimony and Butler did not attempt to refute the fact that he was going too fast for the existing

conditions—he said only that he did not know another boat was present. Although disputed by Butler, there was testimony that he did not make any effort to avoid the accident. *See Atkinson v. State*, 392 So. 2d 205, 207 (Miss. 1980) ("[T]he defendant's failure to make any attempt to go back into his proper North-bound lane or take some other steps in order to avoid the tragic collision was sufficient to sustain the conviction for culpable negligence."). The jury also heard testimony about the broken shift linkage. Butler challenged the evidence against him, called Necaise a liar, and pointed out inconsistencies in the witnesses' testimony for the jury to consider. Although the collision was not intentional, the jury apparently found Butler's actions under the circumstances (including speeding and not paying attention) were grossly negligent and were undertaken with an utter indifference to human life.

*Butler*, 354 So. 3d at 320. Given the evidence before it, the state court's decision was not contrary to clearly established federal law. Nor was it objectively unreasonable. Butler is not entitled to habeas relief.

For these reasons, it is the recommendation of the undersigned United States Magistrate Judge that this habeas petition should be dismissed with prejudice.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Under Rule 72(a)(3) of the *Local Uniform Civil Rules of the United States District Courts for the Southern District of Mississippi*, any party may serve and file written objections within 14 days after being served with a copy of this Report and Recommendation. Within 7 days of the service of the objection, the opposing party must either serve and file a response or notify the District Judge that he or she does not intend to respond to the objection.

The parties are notified that failure to file timely written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation, will bar that party from attacking on appeal the unobjected-to proposed

factual findings and legal conclusions accepted by the district court, except upon grounds

of plain error.  28 U.S.C. § 636, Fed. R. Civ. P. 72(b) (as amended, effective December 1,

2009); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

Respectfully submitted on July 6, 2026.

s/ LaKeysha Greer Isaac
UNITED STATES MAGISTRATE JUDGE